# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

PATRICIA ARMENDO, BARBARA
BATES, KEVIN BEAULIEU, DENNIS
BELCHER, THERESE CHASE,
RACHEL CLANCY, BARBARA COREY,
MICHELLE DEMPSEY, MICHAEL
DOBBINS, JANET DONNELLY, SARAH
EVANS, JAMES FESSEL, LAURE
GAUDET-BOKAS, STEVEN GEORGE,
DENISE GREY, CATHERINE GRICH,
ALLEGRA HAMILTON, SUZANNE
HEEREN, RITA HOLT, KATHY HOYLE,
SARA ISZARD, DENISE KODES,
JUDITH KOLSON, PAMELA LEARNED,
LYNDA MAGUIRE, JEFFREY MALONE,
DAVID MAMO, RYAN MCCANN,
RACHAEL MORIN, MAITEE NOTTLE,
MATTHEW POWER, DINA PYNE,
DENNIS REILLY, JOAN RHINEHART,
MICHAEL RICHARDS, MARIA ROSSI,
CHRISTINE SLINGERLAND, STEPHEN
SOLOMBRINO, CINDY TESSMAN,
PATRICIA THORUP, ROBERTA
VALENTINE, CATHERINE WILLETT,
DOUGLAS WISNER, STEPHANIE
WRIGHT, and JOHN YOBACCIO,

               **PLAINTIFFS,**

VS.

SMITHKLINE BEECHAM
CORPORATION D/B/A
GLAXOSMITHKLINE AND
GLAXOSMITHKLINE, PLC,

               **DEFENDANTS.**

Civil Action No.    12494 DPW

JURY TRIAL DEMANDED

MAGISTRATE JUDGE _Cohen_

RECEIPT # 60396
AMOUNT $ 0
SUMMONS ISSUED YES
LOCAL RULE 4.1
WAIVER FORM
MCF ISSUED
BY DPTY. CLK. FOM
DATE 11/29/04

## COMPLAINT

Plaintiffs' allegations herein are based upon personal knowledge and upon the information and belief of their counsel.

### I.  Introduction

1.     Plaintiffs have ingested the prescription drug Paroxetine ("Paxil") and suffered and/or continue to suffer from withdrawal symptoms following the reduction or termination of their Paxil use.  Defendants, GLAXOSMITHKLINE and GLAXOSMITHKLINE, PLC (hereinafter referred to as "GSK" or "Defendants") have aggressively marketed, advertised and sold Paxil to plaintiffs, wrongfully exposing them to Paxil's withdrawal effects.  At all times relevant herein, GSK knew about these withdrawal effects but, for years concealed, suppressed and downplayed the severity and frequency of their existence to plaintiffs, the medical community and the consuming public.  As a result, plaintiffs were deprived of their ability to exercise their full and informed consent when deciding to take Paxil.  Plaintiffs, therefore, bring this action to recover all available equitable and monetary relief for their injuries and to hold GSK accountable for its past and ongoing violations of Massachusetts law.

### II.  The Parties

2.     Plaintiff Patricia Armendo resides in Worcester, Massachusetts in Worcester county.

3.     Plaintiff Barbara Bates resides in Swampscott, Massachusetts in Essex county.

2

4.    Plaintiff Kevin Beaulieu resides in Milford, Massachusetts in Worcester county.

5.    Plaintiff Dennis Belcher resides in S. Easton, Massachusetts in Bristol county.

6.    Plaintiff Therese Chase resides in Marlboro, Massachusetts in Middlesex county.

7.    Plaintiff Rachel Clancy resides in Marlboro, Massachusetts in Middlesex county.

8.    Plaintiff Barbara Corey resides in Marlboro, Massachusetts in Middlesex county.

9.    Plaintiff Michelle Dempsey resides in Bellingham, Massachusetts in Norfolk county.

10.    Plaintiff Michael Dobbins resides in Charlton, Massachusetts in Worcester county.

11.    Plaintiff Janet Donnelly resides in Medford, Massachusetts in Middlesex county.

12.    Plaintiff Sarah Evans resides in Brookfield, Massachusetts in Worcester county.

13.    Plaintiff James Fessel resides in Cambridge, Massachusetts in Middlesex county.

14.    Plaintiff Laure Gaudet-Bokas resides in Brockton, Massachusetts in Plymouth county.

15.    Plaintiff Steven George resides in Haverhill, Massachusetts in Essex county.

16.    Plaintiff Denise Grey resides in Charlestown, Massachusetts in Suffolk county.

17.    Plaintiff Catherine Grich resides in North Eastham, Massachusetts in Litchfield county.

18.    Plaintiff Allegra Hamilton resides in Norwood, Massachusetts in Norfolk county.

19.    Plaintiff Suzanne Heeren resides in Bolton, Massachusetts in Worcester county.

20.    Plaintiff Rita Holt resides in Westwood, Massachusetts in Norfolk county.

21.    Plaintiff Kathy Hoyle resides in Fall River, Massachusetts in Bristol county.

22.    Plaintiff Sara Iszard resides in Brookline, Massachusetts in Suffolk county.

23.    Plaintiff Denise Kodes resides in Peabody, Massachusetts in Essex county.

24.    Plaintiff Judith Kolson resides in Quincy, Massachusetts in Norfolk county.

25.    Plaintiff Pamela Learned resides in Peabody, Massachusetts in Essex county.

26.    Plaintiff Lynda Maguire resides in Waltham, Massachusetts in Middlesex county.

4

27.    Plaintiff Jeffrey Malone resides in Rutland, Massachusetts in Worcester county.

28.    Plaintiff David Mamo resides in Truro, Massachusetts in Barnstable county.

29.    Plaintiff Ryan McCann resides in Attleborough Falls, Massachusetts in Bristol county.

30.    Plaintiff Rachael Morin resides in Worcester, Massachusetts in Worcester county.

31.    Plaintiff Maitee Nottle resides in Coral Springs, Massachusetts in Broward county.

32.    Plaintiff Matthew Power resides in Stoughton, Massachusetts in Norfolk county.

33.    Plaintiff Dina Pyne resides in Taunton, Massachusetts in Bristol county.

34.    Plaintiff Dennis Reilly resides in Dracut, Massachusetts in Middlesex county.

35.    Plaintiff Joan Rhinehart resides in West Chatham, Massachusetts in Barnstable county.

36.    Plaintiff Michael Richards resides in Milton, Massachusetts in Norfolk county.

37.    Plaintiff Maria Rossi resides in Taunton, Massachsetts in Bristol county.

38.    Plaintiff Christine Slingerland resides in Leeds, Massachusetts in Hampshire county.

5

39.    Plaintiff Stephen Solombrino resides in Wilmington, Massachusetts in Middlesex county.

40.    Plaintiff Cindy Tessman resides in Worcester, Massachusetts in Worcester county.

41.    Plaintiff Patricia Thorup resides in Orleans, Massachusetts in Barnstable county.

42.    Plaintiff Roberta Valentine resides in Wilmington, Massachusetts in Middlesex county.

43.    Plaintiff Catherine Willett resides in Jamaica Plain, Massachusetts in Suffolk county.

44.    Plaintiff Douglas Wisner resides in Dalton, Massachusetts in Berkshire county.

45.    Plaintiff Stephanie Wrights resides in Westford, Massachusetts in Middlesex county.

46.    Plaintiff John Yobaccio resides in Watertown, Massachusetts in Middlesex county.

47.    Plaintiffs are residents of the State of Massachusetts who were not warned of Paxil's ability to cause withdrawal, dependency and addiction, and who have suffered from those same withdrawal effects.  The withdrawal symptoms caused by Paxil are nearly universal in phenomenology and include one or more of the following:

> nausea, anxiety, dizziness, sensory disturbances (including paraesthesia and sensation of cramps), headache, vision distortion, sweating, agitation, fatigue, tremor, sleep disturbances (including intense dreams), confusion,

suicidality, aggression, palpitations, insomnia, irritability, digestive disorders, and asthenia.

48.     Defendant SmithKline Beecham Corporation d/b/a GlaxoSmithKline, was, and still is, a corporation duly existing under, and by virtue of, the laws of the State of Pennsylvania. It is engaged in the business of manufacturing, promoting, distributing, marketing, advertising, and selling pharmaceutical drugs, including Paxil. GSK is, and at all relevant times was, doing business throughout the State of Massachusetts and in this judicial district. At all relevant times herein, GSK tested, manufactured, labeled, marketed, distributed, promoted, advertised and sold Paxil to plaintiffs and to the general public.

49.     Defendant, GlaxoSmithKline, PLC, is a foreign corporation located in and organized under the laws of the United Kingdom. It is engaged in the business of manufacturing, promoting, distributing, marketing, advertising, and selling pharmaceutical drugs, including Paxil, throughout the United States.

### III. **Nature of the Case**

50.     This is a joinder action brought by the above-named plaintiffs pursuant to Rule 20 of the Federal Rules of Civil Procedure.[1] In relevant part Rule 20(a) provides that:

> All persons may join in one action as plaintiffs if they assert any right to relief jointly, severally, or in the alternative in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all these persons will arise in the action. . . . A plaintiff or defendant need not be interested in obtaining or defending against all the relief demanded. Judgment may be given for one or more of

---

[1] Hereinafter, all citations to "Rule" refer to the Federal Rules of Civil Procedure.

the plaintiffs according to their respective rights to relief, and against one or more defendants according to their respective liabilities.

Fed. Rule Civ. Proc. 20(a).

51.    Plaintiffs have all been injured, personally and financially, by the same GSK transactions and seek to have their many common questions of fact and law resolved.  At a minimum, plaintiffs have been injured by:  (1) GSK's company-wide concealment and refusal to warn the medical community about Paxil's ability to produce withdrawal, dependency and addiction; (2) GSK's direct-to-consumer ("DTC") advertisements which uniformly fail to warn that Paxil can cause withdrawal, dependency and addiction; (3) GSK's DTC advertisements which affirmatively state that Paxil is not habit-forming; (4) GSK's failure to provide a package insert which warns of Paxil's ability to cause: nausea, anxiety, dizziness, sensory disturbances (including paraesthesia and sensation of cramps), headache, vision distortion, sweating, agitation, fatigue, tremor, sleep disturbances (including intense dreams), confusion, palpitations, suicidality, aggression, insomnia, irritability, digestive disorders, and asthenia; (5) GSK's knowing and intentional choice to obscure and conceal Paxil's ability to produce severe and painful withdrawal symptoms; (6) GSK's knowing and intentional choice to disregard years of scientific evidence about Paxil's ability to produce withdrawal symptoms; (7) GSK's willingness to expose plaintiffs to significant personal and financial harm; (8) GSK's ill-willed choice to refuse to warn plaintiffs not to go off Paxil without first consulting a doctor, until *after* plaintiffs were already dependant on Paxil; and (9) GSK's intentional choice to cause plaintiffs and their medical doctors/providers to rely on GSK's misrepresentations and omissions regarding Paxil.

52.    Plaintiffs have sustained personal injuries and economic damages as a result of GSK's wrongful acts and omissions and therefore bring this action to recover all available monetary damages allowed by law, in addition to refunds, restitution, disgorgement, and injunctive and declaratory relief.

## IV.  Jurisdictional Allegations

53.    Plaintiffs are residents of the State of Massachusetts.  GSK is a foreign corporation, listing its state of incorporation as Pennsylvania.

54.    Pursuant to 28 U.S.C. §1332, jurisdiction is proper because complete diversity exists between the parties and plaintiffs have each suffered damages in excess of $75,000.00; thus satisfying the amount in controversy requirement.

55.    Venue is also proper in this District because GSK resides in this District for venue purposes and a substantial part of the events and omissions giving rise to plaintiffs' injuries occurred in this District.  *See* 28 U.S.C.A. § 1391.

## V.  Factual Allegations

56.    Plaintiffs all took Paxil pursuant to prescription.  Plaintiffs have each suffered one or more of the above-specified withdrawal symptoms when they reduced or terminated their Paxil usage.  These reactions were unexpected by plaintiffs and their physicians and plaintiffs would not have taken Paxil if they had known about Paxil's general habit-forming nature and ability to cause withdrawal symptoms.

57.    GSK is, and at all times has been, legally responsible for providing adequate warnings about Paxil's true risks and withdrawal effects.

58.    Paxil was introduced into the U.S. market on December 29, 1992.  Paxil is classified as an antidepressant in the selective serotonin reuptake inhibitor ("SSRI") class.  This class includes other well known antidepressants such as Prozac (fluoxetine) and Zoloft (sertraline).

59.    Since its introduction in the U.S., GSK has never warned that Paxil can cause withdrawal symptoms, dependency or addiction.  In fact, GSK has done the opposite, repeatedly telling doctors and the consuming public that:  (1) "Paxil is non-habit forming[;]" (2) "Paxil has been studied both in short-term and long-term use and is not associated with dependence or addiction[;]"(3)"Paxil is not associated with dependence, even in long-term use[;]" (4) "Is Paxil addictive?  No."

60.    These statements affirmatively deny the very facts that GSK admits in other countries.  In the Netherlands, France, Italy, the United Kingdom, Ireland, and Spain, for example, GSK labeling acknowledges that Paxil can cause *withdrawal* symptoms.  Specifically, Paxil's labeling in each of these countries is as follows:

**The Netherlands:**    "[A]brupt discontinuation of Seroxat therapy must be avoided as this may result in *withdrawal* symptoms such as sleep disturbances, sensory disturbances, dizziness, agitation or anxiety, sweating and nausea;"[2]

**France:**    "Abrupt *withdrawal* of the treatment may cause, within one week, symptoms such as dizziness, sensory disorders, sleep disturbances, agitation and anxiety, asthenia, digestive disorders and sweating.  These signs may persist for 1-2 weeks."

**Italy:**    "*Withdrawal* symptoms may occur if treatment is discontinued abruptly.  Such symptoms ... include: insomnia,

---

[2] The trade name for Paxil in some foreign countries is Seroxat, not Paxil, but the drug is the same.

dizziness, sweating, palpitations, nausea, anxiety, irritability, parasthesia and headache;"

**The UK:**  "*[W]ithdrawal* symptoms have been reported on stopping treatment. ... Dizziness, sensory disturbance (e.g. parasthesia), anxiety, sleep disturbances (including intense dreams), agitation, tremor, nausea, sweating and confusion have been reported following abrupt withdrawal of 'Seroxat' [Paxil];"

**Ireland:**  "*Withdrawal* reactions have been reported following discontinuation of 'Seroxat' [Paxil], these include dizziness, sensory disturbance (e.g. paraesthesia), anxiety, sleep disturbances (including intense dreams), agitation, tremor, nausea, sweating and confusion;"

**Spain:**  "*Withdrawal symptoms[.]* Discontinuation of paroxetine administration (especially if it is abrupt) may lead to withdrawal symptoms such as dizziness, sensory disturbances (including paraesthesia and sensation of cramps), headache, sleep disturbances, agitation or anxiety, nausea and sweating."

61.    In the United States, however, GSK actively instructs its drug sales representatives to imply that Paxil does not cause withdrawal reactions. GSK encourages its drug representatives to refer to withdrawal symptoms as "discontinuation symptoms" in order to minimize the serious withdrawal effects associated with decreasing or terminating Paxil use. In addition, GSK instructs its sales force to downplay the increased risk of withdrawal associated with Paxil by telling physicians that "discontinuation symptoms" occur at the same rate with all antidepressants. These representations have misled the medical community.

62.    Because GSK concealed and suppressed the information about the severity and frequency of Paxil withdrawal reactions, neither plaintiffs nor many of their treating physicians were aware that plaintiff's symptoms were withdrawal reactions. As

a result their symptoms were often mis-diagnosed and plaintiffs were subjected to unnecessary tests and medical treatment.

63.    While most of the medical community is still unaware of Paxil's withdrawal problems, some scientists and doctors have known for years that SSRI drugs do cause withdrawal reactions in a significant percentage of users. The evidence documented by these doctors and scientists reveals that Paxil's withdrawal reactions are by far the worst. According to data collected by the World Health Organization ("WHO"), Paxil has the highest incidence rate of adverse withdrawal experiences of any antidepressant drug in the world.

64.    Paxil is the worst offender when it comes to SSRI-induced withdrawal reactions, dependency, and addiction. A principal reason for Paxil's sudden and severe withdrawal problems is the drug's short "half life" (the length of time it takes for a drug to leave the body). Paxil's half life is 24 hours. By contrast, Prozac, one of Paxil's competitors in the SSRI arena, has a half life of several days. While Paxil is said to be favored over Prozac in some aspects of psychopharmacology, Prozac clearly has an advantage over Paxil as to addiction, dependency, and withdrawal. However, owing to GSK's aggressive concealment and suppression of Paxil's addictive characteristics over several years, this fact is not well known, even among medical practitioners. In fact, in a recent survey published in the Harvard Mental Health Letter dated February 2001, it was disclosed that as many as 75% of non-psychiatric physicians were unaware that Paxil can cause dependency/withdrawal reactions or how to properly diagnose the associated symptoms.

65.    Viewed as a "competitive" matter with Prozac, the half life issue was fraudulently exploited by GSK. In 1997, the Drug Surveillance Research Unit ("DSRU"), an official British entity, conducted a study of 13,741 patients who had been treated with SSRIs. Upon conclusion, the study's authors officially reported in the scientific literature that although all SSRIs showed a similar incidence of adverse events overall, Paxil was the worst offender in causing withdrawal. Viewing this as a "competitive" issue with Prozac and another SSRI, Zoloft, GSK's corporate leadership directed its sales force to falsify the DSRU study. All sales personnel were directed to promulgate to physicians in every state that the DSRU study showed all SSRIs induce the same rate of withdrawal. On information and belief, that fabrication reached most of the physicians for which it was intended.

66.    GSK had a legal responsibility to monitor the above scientific literature, and it had a duty to take corrective action to warn doctors and modify Paxil's deficient label *as soon as reasonable evidence of an association between Paxil and these reactions surfaced.*[3] GSK did not do so. In fact, GSK has never warned doctors in this country that Paxil can cause withdrawal symptoms and it did not change its Paxil labeling in this country *until December 14, 2001*, <u>after</u> being prompted to do so by the FDA.

67.    The new labeling does not warn patients that Paxil can cause withdrawal symptoms, addiction or dependence. In fact, the warning section of Paxil's label contains no mention of Paxil's withdrawal symptoms. Instead, the new label vaguely

---

[3] 21 C.F.R. § 201.57 ("labeling shall be revised to include a warning as soon as there is reasonable evidence of an association of a serious hazard with a drug; a casual relationship need not have been proved.")

discusses the occurrence of new clinical trials which tapered patients off the drug, without acknowledging the reason for instituting the tapering regime, i.e. that abrupt cessation of Paxil treatment does in fact cause withdrawal symptoms. The new label does report the adverse events that occurred in these clinical trials, and it does acknowledge that, in the general population, there have been "spontaneous reports" of adverse events in patients who "discontinue" Paxil. The label, however, then goes on to state that "such adverse events may have no causal relationship to the drug" and that "these events are generally self-limiting[.]"[4]  These statements are false, and GSK has

_____

[4]  GSK's revised Paxil labeling currently states:

**Discontinuation of Treatment with Paxil**: Recent clinical trials supporting the various approved indications for *Paxil* employed a taper phase regimen, rather than an abrupt discontinuation of treatment. The taper phase regimen used in GAD and PTSD clinical trials involved an incremental decrease in the daily dose by 10 mg/day at weekly intervals. When a daily dose of 20 mg/day was reached, patients were continued on this dose for 1 week before treatment was stopped.

With this regimen in those studies, the following adverse events were reported at an incidence of 2% or greater for *Paxil* and were at least twice that reported for placebo: abnormal dreams (2.3% vs 0.5%), paresthesia (2.0% vs 0.4%), and dizziness (7.1% vs 1.5%). In the majority of patients, these events were mild to moderate and were self-limiting and did not require medical intervention.

During *Paxil* marketing, there have been spontaneous reports of similar adverse events, which may have no causal relationship to the drug, upon the discontinuation of *Paxil* (particularly when abrupt), including the following: dizziness, sensory disturbances (e.g., paresthesias such as electric shock sensations), agitation, anxiety, nausea, and sweating. These events are generally self-limiting. Similar events have been reported for other selective serotonin reuptake inhibitors.

Patients should be monitored for these symptoms when discontinuing treatment, regardless of the indication for which *Paxil* is being prescribed. A gradual reduction in the dose rather than abrupt cessation is recommended whenever possible. If intolerable symptoms occur following a decrease in the dose

known for at least a decade that Paxil can immediately cause severe and painful withdrawal symptoms in patients who reduce or terminate their Paxil usage.

68.    In addition to the fact that this new labeling does not warn that Paxil itself is responsible for *causing* withdrawal symptoms, most all plaintiffs in this action began taking Paxil before the label change and thus became dependent upon Paxil *before* GSK provided *any* information about what could happen upon the "discontinuation" of Paxil treatment.  After the labeling change GSK also persisted in flooding the physicians' offices throughout the country with false information on Paxil.  As mentioned above, GSK also aired television commercials that encouraged consumers to treat their "generalized anxiety disorder" with Paxil, while trumpeting the false claim that "Paxil is not habit forming."  In line with this misinformation campaign, GSK also handed out glossy colored pamphlets to physicians nationwide that contained no reference to Paxil's ability to cause withdrawal and instead stated only that Paxil "may cause mild, usually temporary, side effects in some individuals."  Again, GSK knew that these statements were false.  GSK knew that Paxil causes severe side effects in a substantial number of individuals and that the drug's addictive qualities have effectively hooked many patients for years, such that many are not able to come off the drug.

69.    Even now GSK continues to directly deceive the public regarding Paxil clinical studies as they pertain to addiction, dependency and withdrawal.  In the same glossy style pamphlets noted above, GSK asks the following question: "Can I Become

_____

or upon discontinuation of treatment, then resuming the previously prescribed dose may be considered. Subsequently, the physician may continue decreasing the dose but at a more gradual rate (see DOSAGE and ADMINISTRATION).

Addicted to Paxil?" GSK then answers that question with the following: "Paxil has been studied both in short-term and long-term use and is not associated with dependence or addiction." The answer is false and misleading because it suggests that the studies systematically probed the dependency and addiction issues, and that Paxil came up clean. That is false. No such studies were conducted as acknowledged by GSK in its new label for Paxil which states:

> DRUG ABUSE AND DEPENDENCE. Physical and Psychologic Dependence: Paxil has not been systematically studied in animals or humans for its potential for abuse, tolerance, or physical dependence. While the clinical trials did not reveal any tendency for any drug seeking behavior, these observations were not systematic and it is not possible to predict on the basis of this limited experience the extent to which a . . . (central nervous system) . . . active drug will be misused, diverted and/or abused once marketed. Consequently, patients should be evaluated carefully for history of drug abuse, and such patients should be observed closely for signs of Paxil misuse or abuse (e.g., development of tolerance, incrementations of dose, drug seeking behavior).

70.    Evidence of GSK's knowledge of the withdrawal reactions its drug was causing can also be found in a report to Dr. Martin Brecher of the FDA which disclosed subjective reporting gathered from patients by clinical investigators who told GSK's management that Paxil was dangerously addictive. A group of 108 patients ending their participation in a trial told GSK that Paxil had caused them to suffer "withdrawal" reactions ("Group of 108 Complaining Patients' Study"). Out of the 1293 patients in that trial, the 108 complaining patients constituted 8.3% of the participants. GSK deliberately and improperly reclassified these patients' withdrawal reactions as "relapse" symptoms. However, "relapse" is not "withdrawal." Relapse occurs when a patient who has improved his/her depressive state then reverts back to a more seriously depressed state. Symptoms exhibited during relapse are qualitatively different from the reactions exhibited during withdrawal. As indicated elsewhere in this

Complaint, it is alleged on information and belief that GSK, over the years, deliberately mischaracterized numerous patients' withdrawal reactions as relapse symptoms.

71.    Notwithstanding GSK's knowledge of the withdrawal reactions associated with Paxil from its pre-FDA approval clinical trials and its post-marketing ten years of Paxil experience with the general patient population, GSK has done nothing about it. GSK has been consciously indifferent to the problem in order to preserve its profits of nearly $3.0 billion a year, and to further increase its market share.

72.    GSK's continued advertising on print, radio, and television regarding Paxil's short "half life" induces both physicians and patients to believe that Paxil has no withdrawal reactions or dependency problems.  In public promotion programs, GSK asserts that Paxil's short "half life" does not affect the therapeutic process and reduces side effects.  As a result, more and more patients are being prescribed Paxil and are becoming dependent on the drug.  The list of patients addicted to Paxil grows daily.

73.    Despite the extensive documented history of withdrawal reactions and dependency/withdrawal syndrome associated with Paxil (as set forth in its internal documents) and an ever increasing number of Paxil withdrawal complaints, GSK adopted a policy of strategic ambiguity to downplay withdrawal syndrome associated with Paxil.  The policy is a public relations ploy.  The strategy recognizes that certain code words must be placed in the public arena to make it appear that GSK is confronting Paxil's safety issues forthrightly.  One tactic in that strategy is labeling "withdrawal" as "discontinuation."  In this, GSK attempts to nullify the negative connotation of "withdrawal" and redefine it with misleading terminology.  This strategy is a fraud on its face.  There is no word "discontinuation" in the medical dictionary.  All

medical dictionaries properly define "withdrawal" as the operative word to describe the condition. The American Psychiatric Association, the official authority on diagnosing such symptoms, likewise specifies "withdrawal" as the proper word.

## COUNT I

## Violations of the Massachusetts Prohibited Trade Practices Act

74.    The allegations of each of the preceding and subsequent paragraphs are incorporated by reference as if fully set forth herein.

75.    Plaintiffs repeat and reallege each and every allegation contained above with the same force and effect as if full set forth herein. Plaintiffs further allege:

     a.    This claim is brought pursuant to M.G.L. ch. 93A, §§2 and 9.

     b.    At all times relevant hereto, Plaintiffs and the members of the Subclasses were "persons" within the meaning of M.G.L. ch. 93A, §1(a) and are entitled to relief under the Act in accordance with M.G.L. 93A, §9.

     c.    At all times relevant hereto, defendant was engaged in "trade or commerce" as defined by M.G.L. ch. 93A, §1(b).

     d.    Plaintiffs entered into consumer transactions with Defendant by purchasing Paxil.

76.    As heretofore alleged, during the course of these transactions, Defendant engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, in the conduct of trade or commerce in violation of M.G.L. ch. 93A, §2, including the following:

a.    Knowingly mischaracterized and miscoded withdrawal syndrome occurring during the clinical trials so as to reduce the number of recorded occurrences of withdrawal reactions;

b.    Failed to inform the medical community that a significant number of individuals taking Paxil during foreign clinical trials experienced dependency/withdrawal syndrome;

c.    Knowingly misrepresented and continues to misrepresent that its clinical trials and investigations adequately tested for withdrawal syndrome;

d.    Knowingly claimed that Paxil's withdrawal problems were a relapse, when in fact they were not;

e.    Actively deceived plaintiffs by representations in written labeling, oral           communications and advertising suggesting that Paxil is not habit forming, that it is not addictive, that it does not cause physical or psychologic dependency, and that it would not cause withdrawal reactions if dosage were reduced or terminated;

f.    Answering the question: "Is Paxil addictive?" with the response: "Paxil has been studied both in short- and long-term use and is not associated with dependence or addiction;"

g.    Implemented false and misleading techniques to hide the linkage between dependency/withdrawal syndrome on one hand, and Paxil on the other.  After censoring the word "withdrawal" from company files and instructing its agents similarly, GSK began to dilute the

medical vocabulary by using misleading medical terms to substitute for withdrawal such as "discontinuation syndrome;"

h.    Over-promoted Paxil in order to increase its sale at the expense of revealing the truth about the addictive/dependency nature of Paxil;

i.    Fraudulently conveyed to all health care providers in the U.S. that Paxil's side effects were only "mild," when in fact GSK knew many of the drug's withdrawal side effects were severe;

j.    Fraudulently conveyed to all health care providers in the U.S. that a British study involving 13,741 patients illustrated that all of the SSRIs exhibited a similar rate of withdrawal reactions, when in fact GSK knew that study illustrated Paxil to have the highest rate of withdrawal reactions among SSRIs as recorded and reported by the authors;

k.    Knowingly misrepresented that Paxil is not habit forming when in fact GSK knows the drug induces dependency in many patients; and

l.    Knowingly engaged in deceptive and fraudulent practices while marketing Paxil in violation of the common law and state law in every jurisdiction in the United States.

77.    GSK intended that plaintiffs rely on GSK's deceptive advertising and misrepresentations.

78.    Based upon GSK's misrepresentations and omissions and wrongful conduct, plaintiffs were deceived and induced to purchase Paxil, and as a result were

injured and suffered damages in an amount to be determined at trial. In addition, plaintiffs are entitled to court costs as set forth more fully hereafter.

WHEREFORE, Plaintiffs pray for judgment against GSK as herein set forth.

## COUNT II

### Fraud and Fraudulent Misrepresentation

79.    The allegations of each of the preceding and subsequent paragraphs are incorporated by reference as if fully set forth herein.

80.    GSK has, since December 29, 1992, defrauded the medical profession in general and plaintiffs' healthcare providers in particular, and the Paxil patient population in general and plaintiffs in particular, in that it, among other acts and/or omissions:

a.    Knowingly mischaracterized and miscoded withdrawal syndrome occurring during the clinical trials so as to reduce the number of recorded occurrences of withdrawal reactions;

b.    Concealed from and failed to inform the medical community that a significant number of individuals taking Paxil during foreign clinical trials experienced dependency/withdrawal syndrome;

c.    Knowingly misrepresented and continue to misrepresent that its clinical trials and investigations adequately tested for withdrawal syndrome;

d.    Knowingly claimed that Paxil's withdrawal problems were a relapse, when in fact they were not;

21

e.    Actively deceived plaintiffs by representations in written labeling, oral communications and advertising suggesting that Paxil is not habit forming, that it is not addictive, that it does not cause physical or psychologic dependency, and that it would not cause withdrawal reactions if dosage were reduced or terminated;

f.    Answering the question: "Is Paxil addictive?" with the response: "Paxil has been studied both in short- and long-term use and is not associated with dependence or addiction;"

g.    Implementing false and misleading techniques to hide linkage between dependency/withdrawal syndrome on one hand, and Paxil on the other. After censoring the word "withdrawal" from company files and instructing its agents similarly, GSK began to dilute the medical vocabulary by using misleading medical terms to substitute for withdrawal such as "discontinuation syndrome;"

h.    Over-promoting Paxil in order to increase its sale at the expense of revealing the truth about the addictive/dependency nature of Paxil;

i.    Fraudulently conveyed to all health care providers in the U.S. that Paxil's side effects were only "mild," when in fact GSK knew many of the drug's withdrawal side effects were severe;

j.    Fraudulently conveyed to all health care providers in the U.S. that a British study involving 13,741 patients illustrated that all of the SSRIs exhibited a similar rate of withdrawal reactions, when in fact

GSK knew that study illustrated Paxil to have the highest rate of withdrawal reactions among SSRIs as recorded by the authors;

k.    Knowingly misrepresenting that Paxil is not habit forming when in fact GSK knows the drug induces dependency in many patients; and

l.    Knowingly engaging in deceptive and fraudulent practices while marketing Paxil in violation of the common law and state law of the State of Massachusetts.

81.    As the result of the above, each and every day, tens, if not hundreds, of patients are becoming involuntarily addicted/dependent upon Paxil because of GSK's false and misleading representations found in both print and electronic media and/or GSK's material omissions.

82.    As a result of GSK's fraudulent acts and omissions as set forth herein, GSK has deceived the medical community, including plaintiffs' healthcare providers, into believing Paxil does not have addictive qualities and does not cause dependency/withdrawal syndrome, which GSK knows it in fact does.

83.    When said representations were made by GSK, it knew those representations to be false, or in the alternative, willfully and wantonly and recklessly disregarded whether the representations were true.  These representations were made by GSK, with the intent of defrauding and deceiving the public in general and the medical community and to induce the medical community to recommend, prescribe, and dispense Paxil and for the public to take it.

84.    At the time the aforesaid representations were made by GSK and at the time that plaintiffs ingested Paxil, plaintiffs and their prescribing healthcare providers were unaware of the falsity of said representations and reasonably relied on GSK's assertions, promulgated through its aggressive sales force to the healthcare providers as set forth herein, that the drug was safe. In reliance upon said representations, such healthcare providers did prescribe Paxil and plaintiffs were induced to and did take Paxil. Had plaintiffs known of the actual dangers of Paxil, through their healthcare providers or otherwise, they would not have ingested Paxil.

85.    GSK's motive of deliberately failing to advise healthcare providers and the

public of the adverse effects that can lead to withdrawal problems (and that it knew a percentage of users of the drug inevitably would experience) was for financial gain and its fear that, if properly labeled, Paxil would lose its share of the SSRI market through the efforts of competing manufacturers who would adversely compare Paxil's half life to their own. GSK's goal, at the expense of those who took its drug Paxil, was for Paxil to become the dominant SSRI on the market.

86.    At all times relevant herein, the conduct of GSK as set forth hereinabove, was malicious, fraudulent and oppressive toward plaintiffs and the public generally, and Defendants conducted themselves in a willful, wanton and reckless manner as set forth hereinabove. Despite its specific knowledge as set forth above, GSK deliberately recommended, manufactured, produced, marketed, sold, distributed, merchandized, packaged, promoted and advertised the dangerous and defective drug Paxil. All of the foregoing constitute an utter, wanton and conscious disregard of the rights and safety of

24

a large segment of the public, and by reason thereof, GSK is guilty of reckless, willful and wanton acts and omissions which evidence a total and conscious disregard for the safety of plaintiffs, which proximately caused the injuries as set forth herein.

87.    As a proximate result of GSKs' fraudulent acts and omissions, and due to Paxil's addictive qualities, inducement of physical and psychological dependency, and inducement of dependency/withdrawal syndrome, plaintiffs acted to their detriment in purchasing and ingesting Paxil, which they would not have purchased or ingested had they been told the truth, and should be reimbursed what they spent.    Additionally, plaintiffs unexpectedly suffered prolonged physical and mental anguish, harm, and suffering and have sustained damages and other losses in an amount to be proven at trial.

WHEREFORE, plaintiffs pray judgment against GSK as hereinafter set forth.

## COUNT III

### Negligent Misrepresentation

88.    The allegations of each of the preceding and subsequent paragraphs are incorporated by reference as if fully set forth herein.

89.    GSK owed a duty to plaintiffs to avoid negligently conveying false information resulting in physical and mental injury to plaintiffs.

90.    GSK breached its duty to plaintiffs by conveying false information on which

plaintiffs relied.

91.    GSK's breach of its duty was the actual and proximate cause of physical

injuries in the form of severe withdrawal reactions in the plaintiffs.

WHEREFORE, plaintiffs pray for judgment against GSK as herein set forth.

## COUNT IV

### Breach of Express Warranty

92.    The allegations of each of the preceding and subsequent paragraphs are

incorporated by reference as if fully set forth herein.

93.    At all times herein mentioned, GSK utilized FDA proceedings, packaging,

promotional materials and activities, and the advertising media to urge doctors, such as

plaintiffs' doctors, to prescribe Paxil, and patients, such as plaintiffs, to purchase and

use Paxil. GSK expressly warranted to physicians, to plaintiffs and to the general

public, that Paxil's association with "drug dependency" and "withdrawal syndrome" were

"rare." As a result, plaintiffs' physicians prescribed Paxil without any warning to the

patients that Paxil could cause drug dependency and withdrawal syndrome.

94.    GSK represented to the consumers who would use Paxil and to the

physicians who would prescribe it -- without full and complete disclosure of the risks of

Paxil's side effects -- that Paxil would not create drug dependency and that "withdrawal

syndrome" was "rare." This amounts to an express warranty.

95.    GSK, knew, or in the exercise of reasonable diligence should have known,

that Paxil has serious side effects and can cause serious withdrawal reactions and dependency/withdrawal syndrome and that the occurrences are not "rare," but rather frequent.

96.    Plaintiffs and their physicians relied on the express warranty representations of

GSK in the use of Paxil, but Defendants breached their warranty because Paxil can and frequently does cause severe withdrawal reactions and dependency/withdrawal syndrome.

97.    As a direct and proximate result of the breach of express warranty by GSK,

plaintiffs sustained damages and other losses according to proof.

WHEREFORE, plaintiffs pray judgment against GSK as hereinafter set forth.

## COUNT V

### Breach of Implied Warranty

98.    The allegations of each of the preceding and subsequent paragraphs are incorporated by reference as if fully set forth herein.

99.    GSK,  through Paxil's labeling, implied that Paxil was at least fit for the ordinary purposes as stated in its labeling.  It was not fit, however, because the promises and affirmations on the labeling stated that drug dependency and withdrawal syndrome were "rare."  That was false.  They are frequent, thus victimizing plaintiffs. Accordingly, the implied warranty was breached.

100.    As a direct and proximate result of the breach of implied warranty by GSK,

plaintiffs sustained damages and other losses according to proof.

WHEREFORE, plaintiffs pray judgment against GSK as hereinafter set forth.

## COUNT VI

### Negligence

101.    The allegations of each of the preceding and subsequent paragraphs are
incorporated by reference as if fully set forth herein.

102.    GSK owed plaintiffs a standard of care to ensure that plaintiffs and their
health care providers were adequately warned of Paxil's addictive qualities and
dependency/withdrawal characteristics before the drug was prescribed.  GSK breached
their duty to exercise that standard of care through their active misrepresentations and
failure to warn.

103.    As a proximate result of GSK's breach of its duty and due to Paxil's
addictive qualities, inducement of physical and psychological dependency, and
inducement of withdrawal syndrome, plaintiffs proximately suffered prolonged physical
and mental anguish, harm, and suffering and have sustained damages and other
losses in an amount to be proven at trial.

WHEREFORE, plaintiffs pray judgment against GSK as hereinafter set forth.

## COUNT VII

### Strict Liability

104.    The allegations of each of the preceding and subsequent paragraphs are

28

incorporated by reference as if fully set forth herein.

105.   At all times herein mentioned, GSK knew or should have known that Paxil was and is addictive and causes dependency/withdrawal syndrome.

106.   At all times hereinafter mentioned, the vast majority of the members of the

general medical community and members of the general public were unaware of the withdrawal dangers existing with respect to the administration of Paxil.

107.   Paxil was used by plaintiffs in the manner and amounts in which GSK intended it to be used.

108.   At all times material hereto, in the United States, Paxil was not properly labeled by GSK. In fact, it was mislabeled and was not accompanied by proper warnings that Paxil can cause withdrawal reactions and dependency/withdrawal syndrome.

109.   GSK promoted and maintained Paxil on the market both to health care providers and directly to patients/consumers with the knowledge of Paxil's unreasonable risk to the public in general, and specifically to plaintiffs.

110.   Paxil, as used by plaintiffs, was defective and unreasonably dangerous when sold by GSK, and Defendants are strictly liable for the injuries arising from its manufacture and plaintiffs' use.

111.   As a direct and proximate result of the foregoing, plaintiffs sustained damages and other losses according to proof.

WHEREFORE, plaintiffs pray judgment against GSK as hereinafter set forth.

## COUNT VIII

### Injunctive and Equitable Relief

112.    The allegations of each of the preceding and subsequent paragraphs are incorporated by reference as if fully set forth herein.

113.    As a direct and proximate result of GSK's actions and/or omissions and conduct as set forth above, plaintiffs have become "hooked" on Paxil. They have become dependent upon Paxil and suffer withdrawal reactions whenever they try to stop using the drug. This harm to their health can only be mitigated by the creation of a medical relief program fund to provide for a medical relief program that, among other things:

> a.    Provides a centralized clearing house to maximize the accumulation of accurate information concerning dependency/withdrawal reactions caused by Paxil;
>
> b.    Provides a central location of accurate information that health care providers can resort to in diagnosing and treating their patients who are experiencing Paxil-induced dependancy/withdrawal reactions;
>
> c.    Provides a centralized information center that evaluates and disseminates information on the effective treatment available to get patients off of the drug Paxil; and
>
> d.    Publishes and otherwise disseminates all such information to plaintiffs and their health care providers.

114.    Many plaintiffs are at risk of misdiagnosis and unwarranted medical treatment because of the general ignorance about Paxil-induced dependancy/withdrawal reactions.

115.    Many plaintiffs have no adequate remedy at law in that monetary damages alone will not compensate them for the continuing nature of the harm to them, and the medical relief program proposed herein may prevent undue health risks before plaintiffs become worse.

116.    Without a court-approved medical relief program that gathers and disseminates accurate information to health care providers and patients, plaintiffs may not receive prompt and proper medical care.  Further, as a direct and proximate result of GSK's actions and/or omissions, plaintiffs and the public have been actively deceived by representations in advertising suggesting that Paxil is not habit forming when in fact GSK knows that the drug induces dependency, and hooks many patients.  GSK should be enjoined from making advertising claims which are inconsistent with Paxil's drug label with regard to dependency and withdrawal.

WHEREFORE, plaintiffs pray judgment against GSK as hereinafter set forth.

## COUNT IX

## Unjust Enrichment

## Refund/Restitution Relief

117.    The allegations of each of the preceding and subsequent paragraphs are incorporated by reference as if fully set forth herein.

31

118.    GSK has benefited by virtue of payment by plaintiffs of the purchase price

of Paxil which they would not have paid had plaintiffs known the true facts regarding

Paxil as set forth herein.

119.    GSK knew or should have known that the benefits are unjust and

unwarranted for all reasons set forth herein.

120.    GSK's retention of said benefits is unjust and unwarranted for all reasons

set forth herein.

121.    As a direct and proximate result of GSK's actions and/or omissions and

conduct as set forth above, plaintiffs are entitled to an award of a refund, restitution and

incidental economic losses, including the purchase price paid by plaintiffs in connection

with their purchase of Paxil.

WHEREFORE, Plaintiffs pray judgment against GSK as hereinafter set forth.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiffs pray judgment against GSK as follows:

1.    After a trial on the merits, the Court enter a judgment requiring GSK to

pay general, specific, and punitive damages in an amount sufficient to punish GSK and

compensate plaintiffs for GSK's wrongful conduct and above listed violations of law;

2.    That a comprehensive court supervised medical relief program be created

as proposed herein to assure the proper and safe treatment of plaintiffs;

3.    For entry of an order requiring GSK to refund and make restitution of all

monies acquired from the sales of Paxil to plaintiffs;

32

4.    The Court enjoin GSK from committing the acts complained of herein, consisting of making advertising claims which are inconsistent with Paxil's drug label with regard to withdrawal/dependency;

5.    For prejudgment and post-judgment interest as allowed by law;

6.    For reasonable attorneys' fees, accountants' fees, and other experts' fees;

7.    For the costs of their suit; and

8.    For such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury.

Dated: November 23, 2004                    By their attorneys,

Tom G. Shapiro BBO #454680
Theodore M. Hess-Mahan BBO #557109
Todd S. Heyman BBO #643804
SHAPIRO HABER & URMY LLP
53 State Street
Boston, MA 02109
Tel:    (617) 439-3939
Fax:    (617) 439-0134

Kevin J. Yourman
Jennifer R. Liakos
Angela S. Rupert
YOURMAN ALEXANDER & PAREKH
3601 Aviation Blvd.,
Suite 3000
Manhattan Beach, CA 90266
Tel:    (310) 601-4108
Fax:    (310) 601-4109

33

Karen B. Menzies
BAUM HEDLUND, A PROFESSIONAL
CORPORATION
12100 Wilshire Blvd., Suite 950
Los Angeles, CA 90025
Tel:   (310) 207-3233
Fax:   (310  820-7444

Christopher L. Coffin
Patrick W. Pendley
PENDLEY LAW FIRM
P.O. Drawer 71
24110 Eden Street
Plaquemine, Louisiana 70765
Tel:   (225) 687-6396
Fax:   (224) 687-6398

Donald J. Farber
LAW OFFICE OF DONALD J. FARBER
7 Mt. Lassen Drive, Suite D-122
San Rafel, CA 94903
Tel:   (415) 472-7181
Fax:   (415) 472-7182

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1.  TITLE OF CASE (NAME OF FIRST PARTY ON EACH SIDE ONLY)     PATRICIA ARMENDO, et al. v. SMITHKLINE BEECHAM

    CORPORATION

2.  CATEGORY IN WHICH THE CASE BELONGS BASED UPON THE NUMBERED NATURE OF SUIT CODE LISTED ON THE CIVIL

    COVER SHEET.  (SEE LOCAL RULE 40.1(A)(1)).

    ___     I.      160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

    ___     II.     195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730,      *Also complete AO 120 or AO 121
                    740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.        for patent, trademark or copyright cases

    _X_     III.    110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
                    315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
                    380, 385, 450, 891.

    ___     IV.     220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660,
                    690, 810, 861-865, 870, 871, 875, 900.

    ___     V.      150, 152, 153.

3.  TITLE AND NUMBER, IF ANY, OF RELATED CASES. (SEE LOCAL RULE 40.1(G)).  IF MORE THAN ONE PRIOR RELATED CASE
    HAS BEEN FILED IN THIS DISTRICT PLEASE INDICATE THE TITLE AND NUMBER OF THE FIRST FILED CASE IN THIS COURT.

4.  HAS A PRIOR ACTION BETWEEN THE SAME PARTIES AND BASED ON THE SAME CLAIM EVER BEEN FILED IN THIS
    COURT?
                                                            YES  ☐        NO  **X**

5.  DOES THE COMPLAINT IN THIS CASE QUESTION THE CONSTITUTIONALITY OF AN ACT OF CONGRESS AFFECTING THE
    PUBLIC INTEREST?    (SEE 28 USC §2403)
                                                            YES  ☐        NO  **X**
    IF SO, IS THE U.S.A. OR AN OFFICER, AGENT OR EMPLOYEE OF THE U.S. A PARTY?
                                                            YES  ☐        NO  **X**

6.  IS THIS CASE REQUIRED TO BE HEARD AND DETERMINED BY A DISTRICT COURT OF THREE JUDGES PURSUANT TO TITLE
    28 USC §2284?
                                                            YES  ☐        NO  **X**

7.  DO ALL OF THE PARTIES  IN THIS ACTION, EXCLUDING GOVERNMENTAL AGENCIES OF THE UNITED STATES AND THE
    COMMONWEALTH OF MASSACHUSETTS ("GOVERNMENTAL AGENCIES"), RESIDING IN MASSACHUSETTS RESIDE IN THE
    SAME DIVISION? - (SEE LOCAL RULE 40.1(D)).
                                                            YES  ☐        NO  **X**

        A.      IF YES, IN WHICH DIVISION DO ALL OF THE NON-GOVERNMENTAL PARTIES RESIDE?

                EASTERN DIVISION  ☐        CENTRAL DIVISION  ☐        WESTERN DIVISION  ☐

        B.      IF NO, IN WHICH DIVISION DO THE MAJORITY OF THE PLAINTIFFS OR THE ONLY PARTIES, EXCLUDING
                GOVERNMENTAL AGENCIES,  RESIDING IN MASSACHUSETTS RESIDE?

                EASTERN DIVISION  **X**        CENTRAL DIVISION  ☐        WESTERN DIVISION  ☐

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME    Thomas G. Shapiro, Theodore M. Hess-Mahan, Todd S. Heyman

ADDRESS   Shapiro Haber & Urmy LLP, 53 State Street, Boston, MA 02109

TELEPHONE NO.   (617) 439-3939

(Filing Category Form.wpd  - 11/27/00)

%JS 44  (Rev. 3/99)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
PATRICIA ARMENDO, et al.
Please see attached sheet for a list of all plaintiffs.

## DEFENDANTS
SMITHKLINE BEECHAM CORPORATION D/B/A GLAXOSMITHKLINE AND GLAXOSMITHKLINE, PLC

**(b)** County of Residence of First Listed Plaintiff   Worcester
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   Out of State
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Tom G. Shapiro, Theodore M. Hess-Mahan, Todd S. Heyman
Shapiro Haber & Urmy LLP
53 State Street
Boston, MA 02109

Attorneys (If Known)

## II. BASIS OF JURISDICTION    (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff

☐ 3  Federal Question
(U.S. Government Not a Party)

☐ 2  U.S. Government Defendant

X 4  Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                                         and One Box for

|  | PLF | DEF |  | | |
|---|---|---|---|---|---|
| Citizen of This State | X 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | X 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT    (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury | **PERSONAL INJURY**<br>☐ 362 Personal Injury— Med. Malpractice<br>☐ 365 Personal Injury — Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>X 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 610 Agriculture<br>☐ 620 Other Food & Drug<br>☐ 625 Drug Related Seizure of Property 21 USC<br>☐ 630 Liquor Laws<br>☐ 640 R.R. & Truck<br>☐ 650 Airline Regs.<br>☐ 660 Occupational Safety/Health<br>☐ 690 Other | ☐22 Appeal 28 USC 158<br>☐23 Withdrawal 28 USC 157<br>**PROPERTY RIGHTS**<br>☐820 Copyrights<br>☐830 Patent<br>☐840 Trademark | ☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce/ICC Rates/etc.<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/ Exchange<br>☐ 875 Customer Challenge 12 USC 3410<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 895 Freedom of Information Act<br>☐ 900 Appeal of Fee Determination Under Equal Access to Justice<br>☐ 950 Constitutionality of State Statutes<br>☐ 890 Other Statutory Actions |
| **REAL PROPERTY**<br>☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | **CIVIL RIGHTS**<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights | **PRISONER PETITIONS**<br>☐ 510 Motions to Vacate Sentence<br>**Habeas Corpus:**<br>☐ 530 General<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition | **LABOR**<br>☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Railway Labor Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | **SOCIAL SECURITY**<br>☐861 HIA (1395ff)<br>☐862 Black Lung (923)<br>☐863 DIWC/DIWW (405(g))<br>☐864 SSID Title XVI<br>☐865 RSI (405(g))<br>**FEDERAL TAX SUITS**<br>☐870 Taxes (U.S. Plaintiff or Defendant)<br>☐871 IRS—Third Party 26 USC 7609 | |

## V. ORIGIN    (PLACE AN "X" IN ONE BOX ONLY)

X 1 Original Proceeding    ☐ 2 Removed from State Court    ☐ 3 Remanded from Appellate Court    ☐ 4 Reinstated or Reopened    ☐ 5 Transferred from another district (specify)    ☐ 6 Multidistrict Litigation    ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION    (Cite the U.S. Civil Statute under which you are filing and write brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
28 USC 1332, 1391

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ 0

CHECK YES only if demanded in complaint:
JURY DEMAND:  X Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY:
(See instructions):
JUDGE _____    DOCKET NUMBER _____

DATE  11/24/2004

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

# CIVIL COVER SHEET
## PLAINTIFF LIST ATTACHMENT

Patricia Armendo, Barbara Bates, Kevin Beaulieu, Dennis Belcher, Therese Chase, Rachel Clancy, Barbara Corey, Michelle Dempsey, Michael Dobbins, Janet Donnelly, Sarah Evans, James Fessel, Laure Gaudet-Bokas, Steven George, Denise Grey, Catherine Grich, Allegra Hamilton, Suzanne Heeren, Rita Holt, Kathy Hoyle, Sara Iszard, Denise Kodes, Judith Kolson, Pamela Learned, Lynda Maguire, Jeffrey Malone, David Mamo, Ryan McCann, Rachael Morin, Maitee Nottle, Matthew Power, Dina Pyne, Dennis Reilly, Joan Rhinehart, Michael Richards, Maria Rossi, Christine Slingerland, Stephen Solombrino, Cindy Tessman, Patricia Thorup, Roberta Valentine, Catherine Willett, Douglas Wisner, Stephanie Wright, and John Yobaccio,